The Honorable, the Judges of the United States Court of Appeals for the 4th Circuit. Oyez! Oyez! Oyez! All persons having any manner or form of business before the Honorable United States Court of Appeals for the 4th Circuit are admonished to draw an eye and give their attention, for the Court is now sitting. God Save the United States and this Honorable Court. Please be seated. All right, we are prepared to hear argument in Fitland v. Harris. Mr. Hafe, is that how it's pronounced? Mr. Harf, Your Honor. All right, please proceed. Thank you, Your Honors. Good morning. May it please the Court, my name is Julian Harf. I'm here on behalf of the appellant in this matter and the defendant in this case, Corporal Quentin Harris. Can you move that mic a little closer to you? Yes, sir. Thank you. Your Honors, of course, this case is here from the Western District of Virginia. This is an excessive force case. Our position is that the District Court improperly denied qualified immunity because under the found by the District Court, Corporal Harris did not violate Mr. Putman's clearly established Fourth Amendment rights. I want to touch first on this threshold issue, which is whether this appeal can be heard on an interlocutory basis. Of course, our position is that it can. I want to note a case that was semi-recent, a Hicks v. Ferreira case, where this Court said, review is limited to whether the defendant is entitled to qualified immunity if the Court takes the facts as the District Court gives them to us. And that is exactly what we are asking Your Honors to do here today. We take no issue with the facts as interpreted by the District Court. Our position is that the District Court made improper legal determination in the analysis of the undisputed facts as it found them because it did not properly evaluate totality of those facts. Now, what the plaintiff has done is he's latched on to this statement by the District Court where the Court said on Joint Appendix page 328, because the facts are in dispute as to whether Harris had a reasonable belief that Putman may have been armed, the defense of qualified immunity cannot be resolved. I want to look at that statement. Okay. Counsel, all I wanted to know was what does the facts, what do the facts show? What position was Mr. Putman in when the dog bit him? Yes, Your Honor. What position was he in? So at the time that the dog was deployed and actually successfully bit Mr. Putman, at that time, he had been pushed to the ground in an attempt for Corporal Harris to place handcuffs or his partner to put handcuffs on Mr. Putman. At that time, he had started to raise off the ground. He was calling the deputies punks at that time. He said, that's funny punk or something along those lines and was starting to stand up. But he was lying on the ground? Well, he was on his knees, Your Honor. He was getting on his knees. He wasn't prone on the ground at that time. He was trying to get up onto his knees at the time that the dog made contact. Does that answer your question, Your Honor? Yeah, of course it did. So looking at this statement, what the Court has said is this appeal is proper if the issue is under the use of excessive force, which is an issue of law. That's exactly what we're asking this Court to decide. Let me ask you, is it ever a question for the jury as to the reasonableness of an officer's interaction with a citizen, like in this case? It seems like the District Court seemed to suggest that, although it may have been worded inartfully, that, as you put it, even if you accept the facts as we have them, and we have the benefit of a videotape here, which is helpful, that all of the facts, both pro and con, suggest that this is an issue for a jury, and I, as a matter of law, can't determine whether or not this officer acted reasonably on these facts. Your Honor, so two things there. I think whether it's a question for the jury in terms of reasonableness, I think the answer is no. I think when you look at our qualified immunity cases in the trial court, there are factual questions. So, for example, special interrogatories put to the jury, and then the Court is ultimately making that legal determination as to whether the conduct was reasonable. It's an objective standard, right? Yes, Your Honor. I also think what the cases say, and specifically what this Court has said in Elliott v. Leavitt, is the fact that the Court uses these magic words, dispute of fact, does not automatically mean that qualified immunity cannot apply when the actual question that the Court is looking at is a question of law. And that's exactly what the Court did here. The question is, which the Court said, is whether Harris had a reasonable belief that Putnam may have been armed. This Court has said that is a legal question, which this Court can determine based on the totality of the circumstances, the undisputed facts that were found by the district court. Okay, so let me ask you about that. So, the facts that we have are we have some evidence that Mr. Putnam had sent the text to his wife indicating that he was obviously distraught, that he was in fact armed. He had put a pistol in his mouth and was threatening to kill himself. So that, I mean, we've got that on text. It seems like the best evidence of what his state was. But when the officers arrived on his property, obviously it's his property, right? He has lawful authority to be on his property. The Second Amendment protects the right of an individual to be armed. So, but when they roused him, I mean, what's the basis for the officers coming upon him and demanding that he turn around and put his hands behind his back, presumably to be handcuffed? Well, at that point... And does he know about that? Was he ever told about that? Was he... I'm sorry, Your Honor. Was Mr. Putnam told exactly why it was that officers were interested in detaining him? Your Honor is correct. Not at first. But eventually there's this back and forth where Mr. Putnam asked for what, you know, why do you want me to turn around? Why do you want me to put my hands behind my back? And one of the deputies says, did you say you were going to kill yourself? And he responds, no. That was the deputy's attempt at that point to tell him why they were there. Now, in terms of why they're coming upon him and having him, you know, ordering him to get up, I think it's clear from, it's based on what knowledge they had leading up to that moment. So, you know, obviously we have these text messages from Putnam to his spouse, to his wife, saying I'm going to kill him. I have this gun. I'm going to use it to kill myself. They then come upon him. They have to track him deep in the woods. And this man is lying in what the district court noted was a, what the district court deemed as a shallow grave. He's then smelling of alcohol. There's cans of an alcoholic beverage near him. So we have, as the district court noted, signs, indicia of instability at this point. So everything that the text messages, everything they saw with their own eyes at that point were consistent with what the text messages said. So at that point, that's the reasonable basis. And the district court said they had a reasonable basis to seize him at that point. So the question is not could he be seized. That the district court has said, the district court has said he could be seized. That question was answered by the district court. The question becomes how much force can be used? Because the district court also noted when looking at the grand factors. I think the district court is asking the question, if you had probable cause for an arrest or a seizure, why did you need the dog? What was the, what role did the dog play? You didn't see a gun in this encounter. But why not, why wouldn't arrest or seizure be a less drastic means of handling the matter as opposed to putting a, letting a dog loose on him? Your Honor, I think the goal was to seize him. And the case law is clear that we can use reasonable force to do so. I think what the officers are thinking at that time is, and what the testimony is, is that we have these text messages saying that he has a gun. This isn't an, you know, this isn't just an abstract theory that they have, that he may have a gun. This is something that came from Mr. Publin himself telling his wife that he has a gun. So the use of the dog at that point, and again, this isn't an immediate use of the dog. This was after a two-minute back and forth where they are giving him command after command to space away, turn around, put your hands behind your back. They are then telling him why they did that. And all the while, he's refusing those commands. He's swearing at the officers. He's telling them to get the F off my property. He's clearly showing signs of intoxication. He's clearly angry. The district court found that he was being combative and evasive, evasive being another sign of suspicion. And after that two-minute period, these officers don't, they know they can seize him. They know they can use reasonable force to do so. At that point, the question becomes, well, what force is reasonable? Now, I will note that what this court has said it should consider is the force deployed at the, is the force used at the time. So at the time the force was used, that's what we're looking at. At that time, we know that hands-on force wasn't enough because at that time, he had been pushed, Mr. Putnam had been pushed to the ground, and he was trying to get up. And so then you have a situation where— You're skipping by the initial use of the dog. Yes, Your Honor. The reason he was on the ground is because the dog had been deployed and had knocked him to the ground. Yes, Your Honor. That is true. So isn't that the question, whether or not that was a reasonable use of force in that instance, given as Judge Wilkinson indicated that at least as best they could tell, there was no indication that they couldn't see a weapon, they couldn't see a gun? Your Honor, I think, frankly, I think that's an open question. I'm not sure, I'm not sure that the, that, when the dog was initially deployed, the dog didn't make contact. So there was no—the force that we're all talking about here is a dog bite. That force didn't happen until after Mr. Putnam is getting up. So if we take that, so if we assume that that is the—that there's essentially two, maybe two times that we're looking at here, the first initial deployment and then the actual contact, the deployment was still reasonable. And certainly the fact that he hasn't tried to stand up by that point doesn't change that fact. At that point, again, we have information that this man is, from him himself, that this man is armed with a gun, that he is potentially intoxicated, that he's acting on a rape, that he's refusing commands. And frankly, that's the mechanism that this officer has to detain this person because that, you know, he's got a leash, he's got a dog in—he's got a dog on a leash in one of his hands. So he's making that split-second determination at that point. Well, if I try to detain this person, which I—which the court has said is reasonable, the district court said we can detain him, what is going to happen when I do that? And that is the reason that the dog was appropriate and reasonable to deploy at that time because the officer does not have to be put in a position where he tries to simply use hands-on force and just, you know, put the guy's hands behind his back after two minutes of the guy refusing to do that. And risk the—and risk the idea that this person might take out a gun that he said he had mere two hours earlier and shoot the officers. Is it—is the fact that—you just point that out, that officers had evidence that he had been—was armed coming from his own mouth via electronic text. If they didn't have that evidence and simply came upon him in this circumstance, no indication that he was armed, is that a different case? Yes, Your Honor. I do think that's a different case. I think if the circumstances here are that we have no reason to believe—I think it's a closer case. I mean, I think it's a closer case. I don't think it's necessarily that we—it's not reasonable to use the dog, but certainly, that's a different case. If we have no reason to believe he—for example, in Armstrong, when they know he's unarmed, that is—that's—and we've made that distinction on Bree, that is a different case. This case, we have a credible—which the district court noted, we have reliable information that this man is armed. What we are not required to do is take the man's statements, and the district court noted that, well, verbally, he only threatened to harm himself. And then he said he did—he wasn't armed. Well, we are not—the law is clear that we are not required to take Mr. Puppman's statements at that time as gospel. We are not—we are not required to take that as truth because a mere two hours earlier, he had said the opposite. And, of course, we're coming upon him in all these strange circumstances and potentially intoxicated the individual. When we have a reason to believe that he's armed and dangerous, we can confirm that by doing a hands-on frisk. That's clearly established law, of course, Terry v. Ohio. So the officers at that point knew that they could seize him. The question is how much force could be used. The district court said that the dog was too much but didn't tell us what would have been reasonable. We know that some force would have been reasonable. We know that we have this information that he's armed, that he's suicidal. He's clearly in a state of mind that is not baseline. And for that reason, we believe this case is different than a case where we have no information that he's armed. Your Honors, I see my time is winding down. Just because of the technical difficulties, would you mind if I make a few more points? All right. Thank you very much, Counsel. We appreciate your argument. And if my colleagues have questions, I'll let you stand up. Otherwise, we'll hear from you in rebuttal. All right? Thank you, Your Honor. Good morning. Mr. Lucetti, let's hear your side of it. Yes, Your Honor. Good morning, Andrew Lucchetti. On behalf of the appellee, Mr. Dillard Putman, we respectfully request that this court affirm the district court's denial of summary judgment on the basis that…  Yes, Your Honor. Had you been the officers, how would you have handled this situation? I know you think that the way they handled it was incorrect, but what would you have done? If I was the officer, I would have said, are you Mr. Putman? And when he identified himself, I said, Mr. Putman, your wife called and said that you want to harm yourself. Do you want to harm yourself? Sir, are you armed? None of these questions they asked. They came upon Mr. Putman, and the district court found that Mr. Putman did not have a gun in his mouth, and he was lying calmly in the hole. And when they came upon him, instead of… They told him to get up, and he says, he calmly responds, get up for what? I live here. Obviously, he didn't know why they were there. Counselor, let me ask you this. Would it have done any good to have asked those questions, given the fact that the district court found that he was noncompliant, and that he was alcohol impaired, and that he was swearing at the officers, and all the rest? What good would those kinds of questions have done with a very inebriated individual who is, in the district court's words, noncompliant, swearing, and abusive? Why do you think that's not… That's not what the district court said, Your Honor. I take umbrage with Mr. Harff's characterizations of the facts as the district court found them. If we look at the facts as the district court found them, the court found that Mr. Putman did not make any threatening movements or statements towards the officers. Joint Appendix 321. The court found that Mr. Harris ordered the canine to bite Mr. Putman after a mere two minutes of verbal instruction. Well, let me just say this, that the district court characterized the individual's response as combative, and said that he swore repeatedly at the deputies, that he had refused commands to turn around or face away. And so the question I have for you is, what good were the questions that you were saying the officers should have asked? What good would they have done? I think they would have done some good, Your Honor. Mr. Putman was calmly asking the officers why they were on his property in the first instance, and they didn't tell him. They said, you say you're going to kill yourself. That's all they told him. They didn't say, we're here to detain you, not for an arrest. We're not here to arrest you. We're here to detain you for an involuntary mental health seizure. We're here to take you to the hospital to see if you are indeed a threat of harm to yourself. And this court has said that when the government's sole interest is preventing harm to the subject of the seizure, serious injurious force cannot be used until an immediate threat of harm that can be ameliorated by the use of such force. The district court found no such immediate threat of harm. And in fact— Can I follow up on Judge Wilkinson's question? Yes, Your Honor. So you raise a good point. They could have done a number of different things, but that really isn't the test, I don't think. The question is whether these officers, given the circumstances in which they found themselves, acted with it. What I think the law is a wide range of reasonable conduct. And we have to keep in mind that the overarching objective of qualified immunity is to immunize all but the most incompetent and unreasonable of officers. So, yes, they could have done what you suggested. They opted not to. And the district court found that they were entitled to seize your client. And the question is, is it reasonable for them to have done so in the manner that they did after giving him multiple warnings to turn around and, you know, submit to their show of authority and his refusing to do so? And I will admit to you that there's no evidence that he was physically combative, but he was verbally combative. So, again, I guess I'll go back to just Wilkinson's questions. What were they to do at that point, having not done what you suggested? They could have seized him without using the dog. In fact, the officer puts his rifle down and pulls out his taser and then decays Mr. Putnam. Right. And you don't complain about that.  That's the result that I mean, the significance of the injury is a factor to be considered in the Graham analysis, Your Honor. And this court has said in all cases that say that once a dog is deployed, the amount of time that he is actually latched on to the individual is not the not the fault of the particular officer. And we don't. The issue is the release of the dog in the first instance. And this court and the district court found at that time. But Mr. Putnam was not attempting to flee or was he physically resisting when he when Harris released the dog? Rather, he was standing with his hands outstretched, repeating his demands to see a warrant, as he had done for the past minute. Putman's refusal to comply with shouted commands, while it calls for some concern, do not import much danger or urgency into a situation that was, in effect, static impasse. That is a factual finding. So let me just ask a different question. So what's the factual dispute there? I mean, the judge seems the factual dispute. Hold on. Hold on. It seems to be accepting the facts as they appear on the record and in the videotape. So what is the factual dispute? According to the court, that a reasonable jury could could could find that. A reasonable officer on the scene could have understood that Mr. Putman was armed. And that under those circumstances, that. And this is my belief of what the district court meant. Your honor is that under that circumstance, then there would be the qualified immunity would apply. But is that the law? I mean, it's an objective test. So I don't think I don't think that is the law. Your honor. And I think young Prince George County makes clear that just because a person is armed doesn't give the officers carte blanche to use any force. No. What I meant is, is it the law that that sets up a disputed issue of fact? Or is it ultimately a question for the judge? Assuming the facts are undisputed. Well, I think it depends on the on the question, your honor. So and then clearly, is that whether there's a violation? I think. I don't think it's material. I think I don't think it's dispositive, but it is material, whether or not Mr. Putman, the officer, reasonably believe Mr. Putman was armed. Mr. Putman was not armed. That's undisputed. And it's undisputed that he had no weapons in his immediate vicinity as the dog and the dog handler went and searched the woods after they seized him and found no. So it is undisputed that Mr. Putman was unarmed. Despite Mr. Hart's characterization. I don't see this. Was it reasonable to believe that Mr. Putman was armed and had a gun somewhere in his waistband, given the fact that the text message that led the officers to the residence said that he was. Her husband, Pittman, had a gun and was going, quote, to end it all. The whole the whole reason. That the officers were there was because the message from the spouse indicated that he was suicidal and at least had a gun. Besides, the officers have this one report to go on. It's it's a very difficult situation for them. Very, very confused situation. And the question, I guess, is whether they were acted within a range of reasonable alternatives and the text message would lead a reasonable person to believe that you had an inebriated and suicidal individual with a gun to carry out his avowed wishes. And I think they were trying to. The officers were trying to obey the. Respect the wife's wishes and save this individual for himself. And you wonder, well. Is this a question of whether or where no good deed goes unpunished? Because they were acting at the behest of a spouse and they were trying to save this man's life. And so. I'm just asking you why, in light of all that, isn't this. Well, for one, while the district court found that Mr. Putman did indeed make those statements and those statements from Mr. Putman, the officers on the scene did not have that information. The only information they had was that Miss Putman Candy Putman told them that her husband had texted. Texted her these messages and show the officers these messages. And while the officers have. The ability to rely upon that, it doesn't mean that that is. That those text messages are certainly from Mr. Putman. And in any event, when they come upon the scene. As the officers that were that Officer Harris and Officer Hayden that went up in the woods did not see the text messages. They were told by officers Baldridge and Bowles that Mr. Putman was suicidal and that he had a gun in his mouth when they approached the scene. Mr. Putman did not have a gun in his mouth. Mr. Putman did not have a gun in his hands. Mr. Putman was laying down taking a nap. He woke up to see a dog staring down on him. And the first thing he was told. Get up or get your hands up and he says for what I'm on my property and instead of saying. Because your wife called and said you're suicidal, he says, get up or my dog is going to bite you. That is unreasonable, Your Honor. The government's sole purpose in this case was to prevent Mr. Putman from harming himself. Not once did he threaten anyone, not the officers, not Miss Putman, anyone but himself. And in that case, the government's sole interest in this matter is to prevent him from harming himself. And they cannot use serious injurious force to seize Mr. Putman until an immediate threat more than an imminent threat. An immediate threat that can be ameliorated by the use of that force. Mr. Putman, when the dog was released, was standing with his hands outstretched, repeating his demands to see a warrant and asking why they were there. What he had, what had he done wrong to be arrested? And instead of telling him, they stick a dog on him and cause a significant, serious injury. One that requires life saving, life saving emergency vascular surgery. This was a significant, significant use of force. So the first time the dog was deployed, he missed, right? Absolutely. Okay. So you don't have a claim for excessive force based on that, do you? Well, I think the court has said we don't look at a granular moment in time, but we look at the whole event. Well, his colleague on the other side says at that point, once he was on the ground, he began resisting. And that justified the second use of force. He did not. He was passively resisting. He didn't throw any punches. He didn't kick. He didn't jump up. He was laying on his side in the office and said, put your hands behind your back. How was Mr. Putman supposed to accomplish that command with his arms in front of him, lying on his side without getting up on his knees, Your Honor? A reasonable jury could find that Mr. Putman was actually complying with the officer's commands. He put his hands behind his back and he was just saying, you're funny, punk. You're effing funny, punk. He didn't wildly gesticulate. He didn't kick his feet. He didn't throw his arms. He didn't buck his body. He just sort of fenced up. And at that time, he re-released the dog on Mr. Putman while Mr. Putman was being tased in the back. You're putting a bit of a gloss on what the district court said, are you not? The district court did not find he was the kind of calm and compliant individual that you're describing. No, the district court said that Mr. Putman was calmly lying in the hole when the officers arrived and that the court found that Harris ordered the candidate to bite Mr. Putman after a mere two minutes of verbal instruction without any particular action by Putman, shifting the dynamics or escalating the situation into immediate threat. That is a factual finding by the district court that this court is bound by. And under Armstrong, it is clearly established that that is unlawful and every officer should know that. In the Armstrong case, the plaintiff was not swearing at the deputies and there was no evidence that the plaintiff was armed or had a gun at all. And it was plain in the view of the majority that the plaintiff posed no threat of any kind to the officers. But that's not clear here. The district court found otherwise, Your Honor. And there was no tasing here. He was tased as well. All right. There was no shooting at him. No, Your Honor. But the interests involved are the same. The government's interest in Armstrong was to prevent Mr. Armstrong from harming himself. And the officers in that case had a warrant. The officers in this case did not have a warrant. They were on his property without Mr. Putnam's consent to involuntarily seize him to force him for mental health evaluation. Mr. Putnam denied sending those text messages. Here's the thing. It seems unlawful from a common sense perspective for officers to go onto someone's property and use serious and serious force to make him comply for a mental health seizure. Mr. Putnam is not a criminal. No, no, no allegation that Mr. Putnam threatened anyone except himself. He didn't threaten his wife. He didn't threaten the officers. And the court found those facts. And under the facts as the district court found them, qualified immunity is inappropriate. And we ask the court to affirm the district court's ruling in this matter. Do you have any further questions? We thank you. Thank you very much. Thank you, Your Honor. Thank you. Counsel, do you have some time for rebuttal? I believe I do, Your Honor, and I just want to make one or two very brief points. Your Honor, there was significant discussion about the Armstrong case. This is what the court ruled in Armstrong. An officer cannot use force that risks substantial harm to the subject if, when dealing with a mentally ill person, that individual is, quote, unarmed and minimally threatening. That's why the district court was in error when it applied or when it compared Armstrong to this case and used Armstrong as its guidance, as its authority to deny qualified immunity. Because it's impossible to watch the video in this case, keeping in mind the information that these officers had from Huffman's wife, that he had texted her saying that he was suicidal and had a gun. It's impossible to watch this video with that information in light of all the other things, strange circumstances that we're talking about, coming upon him a mile from his house in the woods, or less than a mile, but deep in the woods, lying in the stitch, smelling of alcohol. It's impossible to know all that and then say that this man was, quote, unarmed and minimally threatening. Now, as an aside, and the court touched on this, I think it's telling that neither the district court nor the plaintiff takes issue with the fact that the other deputy, Hayton, used a taser on Mr. Huffman. The district court and the plaintiff rely on Armstrong, which is a taser case. So, in other words, what they're doing is they're comparing the taser to the dog in this instance, which makes sense. This court has said that a taser is severe and injurious force. Now, what the court also said about tasers in that case, in Armstrong, said tasers are proportional force when deployed in response to a situation in which a reasonable officer would perceive some immediate danger that could be mitigated by using the taser. That's exactly what we have here. We had a reasonable officer believing that they perceived some immediate danger that could be mitigated by using the taser, which is why the other deputy used the taser, Hayton, and why Harris deployed the police canine. We would submit that if it's not clearly established that you can't use a taser here, it's also not clearly established that you can't use the police dog, especially in light of the fact that that's really only Harris's only mechanism of force other than pulling out a higher degree of force in a deadly weapon. It seems like what the district court would have these deputies do is wait until there is a weapon out, a weapon pointed at them, and at that point, we're probably escalating to deadly force. So, our position, Your Honor, is that these officers did not have to wait until this man pulled out the gun that he had told his wife he had a mere two hours earlier, and that based on the existing case law that qualified immunity applies and the district court erred. I just want to point out briefly, I'm not going to belabor the cases I cited on brief, but I do think I want to highlight the Zuris case under the Sixth Circuit, which came out in 2020 after the Armstrong case. The reason why that case is instructive is because it provides an excessive force analysis where law enforcement officers released a K9 on a noncompliant individual acting under suspicious circumstances, who the court deemed an unknown quantity, arguing with the officers, waving her hands around, refusing to face away from the officers. Now, officers in that case didn't know whether she was armed or not. There was no report that the plaintiff was armed. Here, we have knowledge from Putman himself, Putman's own words to his wife, or at least that's what we believe based on the wife's statements, that Putman said that he was armed with a gun and was going to use it to kill himself. The difference in the Sixth Circuit case, though, and maybe it doesn't make a difference, is that that individual was considered to be a criminal suspect, right? Your Honor, the plaintiff's boyfriend was a criminal suspect. Wasn't she part of that? I mean, they had some indication that she might have been involved as well. She was in the vehicle that he was driving. I don't believe the court made any reference to her being a suspect at all. Her boyfriend certainly was a suspect in the armed robbery. That's true. But the officers in that case had no information that the individual that was stopped, so the boyfriend fled in that case prior to the car being stopped. The officers had no information that she was a danger at all until she essentially got out of the car and did a whole bunch of things like Mr. Putman did to show that she could be a threat. And I see I'm out of time, Your Honors. We ask that you reverse the ruling of District Court and award qualified immunity to the officer. Thank you, Your Honors. All right. Thank you very much. I want to thank you both for your arguments. And we're sorry we can't come down and greet you, but I think you understand the reasons. And let's proceed into our next case.
judges: J. Harvie Wilkinson III, Albert Diaz, Max O. Cogburn Jr.